## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Brenda Counts,

                   Plaintiff,

v.

United of Omaha Life Insurance
Company,

                   Defendant.

_____/

Case No. 18-12312

Judith E. Levy
United States District Judge

Mag. Judge Mona K. Majzoub

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [33] AND DENYING DEFENDANT'S MOTION FOR JUDGMENT AFFIRMING DENIAL OF BENEFITS [30]

## I.    INTRODUCTION

Plaintiff Brenda Counts brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and § 1132(a)(3), against Defendant United of Omaha Life Insurance Company for denying Plaintiff's applications for short-term and long-term disability benefits.

Plaintiff, a flower sales specialist, worked for Denver Wholesale Florist-Flint for twenty-seven years and has been covered under Defendant's disability insurance policy since January 1, 2016. After battling lower back pain since 2013, and attempting an increasingly severe regimen of pain medications, physical therapy, steroid injections, and a spine surgery, Plaintiff's physicians concluded in 2017 that Plaintiff's spine had deteriorated to the point that Plaintiff was "totally medically disabled." Plaintiff applied for both short-term and long-term disability benefits in 2017, and Defendant denied both claims in 2018. Plaintiff sued Defendant for the benefits on July 24, 2018.

This issue is before the Court on cross motions for summary judgment on the administrative record. For the foregoing reasons, the Court finds that Plaintiff was entitled to both short-term and long-term disability benefits under Defendant's disability benefits policy. Accordingly, Plaintiff's motion for judgment on the administrative record is GRANTED, and Defendant's motion to affirm denial of benefits is DENIED. The case is REMANDED to the administrator to determine the benefits award in accordance with this Order. The parties may submit supplemental briefing on attorney fees.

## II.   BACKGROUND

### A. The Benefits Plan and Plaintiff's Work History

Plaintiff worked for Denver Wholesale Florist-Flint ("DWF") from August 28, 1989 to May 10, 2017, as an "Inside Sales Associate." (ECF No. 29-1, PageID.304.) As an "Inside Sales Associate," Plaintiff was responsible for cutting, organizing, and selling flowers. (ECF No. 29-9, PageID.141.) This position also required "[m]aking sales calls, pulling product[,] and packing." (ECF No. 29-9, PageID.135.)

Plaintiff became insured under the ERISA-governed United of Omaha Life Insurance Company Benefits Plan ("United" and "the Plan") on January 1, 2016. (ECF No. 1-2, PageID.22-23.) Plaintiff filed two claims under this Plan. Plaintiff's first claim requested short-term disability benefits in June 2017. (*See* ECF No. 29-9, PageID.1990.) Plaintiff later additionally filed for long-term disability benefits after she became eligible in August 2017. (*See* ECF No. 29-14, PageID.2932.) For purposes of both short-term and long-term disability benefits, the Plan defines "disability" as follows:

> *Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred, as a result of which:

a) during the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Job (on a part-time or full-time basis); and

b) after the Elimination Period, You are:

1. prevented from performing at least one of the Material Duties of Your Regular Job (on a part-time or full-time basis); and

2. unable to generate Current Earnings which exceed 99% of Your Basic Weekly Earnings due to that same Injury or Sickness.

(ECF No. 29-1, PageID.287.) The Plan defines "sickness" as "a disease, disorder or condition, including pregnancy, that requires treatment by a Physician. Disability resulting from a sickness must occur while You are insured under the Policy." (*Id.* at PageID.289.) The Plan defines "material duties" as "the essential tasks, functions, and operations relating to Your Regular Job that cannot be reasonably omitted or modified." (*Id.*) The Plan does not define "significant change."

The Plan's short-term benefits policy provides beneficiaries with weekly pay that is 60% of a beneficiary's gross weekly earnings, and the long-term benefits policy provides beneficiaries with monthly pay that is 60% of the beneficiary's gross monthly earnings. (*Id.* at PageID.271-272, ECF No. 8-3, PaegID.136.) Both plans exclude the following income sources in their calculations: commissions, bonuses, overtime,

contributions to deferred compensation plans, and extra compensation. (ECF No. 29-1, PageID.271-272; ECF No. 8-3, PageID.135.) Short-term benefits last up to eleven weeks, with an elimination period (the number of days of continuous disability which must be satisfied before beneficiaries could receive benefits) of fourteen days. (ECF No. 29-1, PageID.271, 278.) Both benefit programs require beneficiaries to "apply for and pursue" other income sources for which they are eligible, including Social Security. (ECF No. 29-1, PageID.274; ECF No. 8-3, PageID.137-138.)

United categorized Plaintiff's occupation as a "light strength job." (ECF No. 29-1, PageID.297.) United's description of a light strength job is as follows:

> A light strength job require[s] exerting up to 20 pounds of force occasionally [], and/or up to 10 pounds of force frequently [], and/or negligible amount of force constantly [] to move objects.[1]
>
> Even though the weight lifted may be only a negligible amount, an occupation should be rated Light work
>
>> (1) when it requires walking or standing to a significant degree; or

---

[1] United defines "occasional" as "activity or condition exists up to 1/3 of the time," "frequent" as "activity or condition exists 1/3 to 2/3 of the time," and "constant" as "activity or condition exists 2/3 or more of the time." (ECF No. 29-1, PageID.297.)

(2) when it requires sitting most of the time, but entails pushing/pulling of arm or leg controls; and/or

(3) when the occupation requires working at a production rate pace entailing the constant pushing/pulling of materials even though the weight of those materials is negligible.

Note: industrial setting can be and is physically demanding of a worker even though the amount of force exerted is negligible.

(*See id.* at PageID.297-298.)

## B. Plaintiff's medical history

In early 2014, Plaintiff began seeking medical help for back pain. (*See, e.g.*, ECF No. 29-10, PageID.2230, 2232, 2234.) In May 2014, Dr. Kazem Hak diagnosed Plaintiff with herniated disc syndrome after Plaintiff complained of low back pain that shot down to her buttocks and legs. (ECF No. 29-10, PageID.170.) After conducting an MRI, Dr. Hak identified the herniated disc as "L4" and noted that Plaintiff additionally had a "right side[] compromise and moderate spinal stenosis." (*Id.*) Dr. Hak prescribed pain medications and scheduled a series of follow-up appointments. (*Id.*)

Beginning in November 2014 and continuing through May 2015, Plaintiff received regular lumbar epidural steroid injections into her lower back. (ECF No. 29-3, PageID.684, 686, 688, 690, 692, 694.) These

injections were intended for pain relief, and after each injection the physician report noted that Plaintiff "left the office in stable satisfactory condition." (*Id.*) Plaintiff also participated in physical therapy from November to December 2014. (ECF No. 29-8, PageID.1828.)

Though the injections and therapy provided Plaintiff with temporary relief, by July 2015, Plaintiff's pain was "getting worse." (ECF No. 29-8, PageID.1828.) Plaintiff reported to Dr. David Fernandez, of OrthoMichigan, complaining of increasing pain that was "sharp, achy, cramping and burning." (*Id.*) Dr. Fernandez noted that Plaintiff's pain "affect[ed] her sleep," that the pain was "[a]ggravated by sitting, standing, walking, lifting, [and] going up or down stairs," and that Plaintiff reportedly "c[ould] only walk two to three blocks." (*Id.*) Dr. Fernandez also noted that Plaintiff was "working in sales and was doing heavy lifting." (*Id.*)

After performing a physical examination and finding "[n]o pain [] with range of motion," Dr. Fernandez ordered x-rays of Plaintiff's lumbar spine. (*Id.* at PageID.1829.) After reviewing the x-rays, Dr. Fernandez diagnosed Plaintiff with "lumbar spondylosis," "lumbar degenerative disc disease," "L4-5 stenosis from ligamentum flavum hypertrophy and facet

anthropathy and diffuse disc bulge," "low back pain," "neurogenic claudication," and "bilateral lower extremity radiculopathy." (*Id.* at PageID.1829.) Noting that Plaintiff had "already exhausted nonoperative options [] includ[ing] physical therapy, epidural steroid injections and medications including narcotics," Dr. Fernandez recommended a bilateral L4-5 decompression surgery. (*Id.* at PageID.1829-1830.) Dr. Fernandez also noted that he was "very clear [he] could not guarantee results and [Plaintiff] could be the same, better[,] or worse." (*Id.* at PageID.1830.) Dr. Fernandez warned Plaintiff that she "may always have some back pain from the degenerative changes [to her spine]." (*Id.*) Nevertheless, Plaintiff elected to proceed with the surgery. (*Id.*)

On July 29, 2015, Dr. Fernandez performed a bilateral decompressive L4-L5 laminotomy and partial medial facetectomy on Plaintiff. (ECF No. 29-8, PageID.1837.) At this point, Plaintiff had been taking Norco—an opioid pain reliever—for "over a year and a half." (*Id.* at PageID.1827.) Plaintiff's two-week post-surgery appointment notes reveal that Plaintiff recovered well, and Plaintiff's doctors were hopeful about weaning Plaintiff off her pain medications. (*Id.*) Eight weeks after the surgery, in October 2015, Plaintiff "blew [her] back out" and had some

mild swelling and fluid collection around her surgery incision, but was otherwise able to walk a mile a day and doing well. (*Id.* at PageID.1825.) However, Dr. Fernandez's February 2016 follow-up notes state that Plaintiff continued to recover "until she went back to work" in November 2015. (*Id.* at PageID.1823.) Dr. Fernandez noted that Plaintiff "does a lot of heavy lifting" at work and that she "began having pain that started in the left lower buttock and radiated down the left lower extremity posteriorly to her foot . . . [i]t is affecting her ability to do activities. She is on her feet all day long." (*Id.*) Dr. Fernandez recommended another MRI of Plaintiff's lumbar spine. (*Id.* at PageID.1822.)

Based on the MRI, Dr. Fernandez found in May 2016 that Plaintiff's spine had undergone "postoperative changes" that included "a large amount of" scarring and a "large heterogeneous peripheral enhancing fluid collection." (*Id.*) Dr. Fernandez discussed next steps with Plaintiff, which included possible use of a "spinal cord stimulator." (*Id.*) Finally, in response to Plaintiff's complaints of wrist pain, Dr. Fernandez noted that Plaintiff may additionally "have carpal tunnel syndrome" and prescribed an EMG and NCV with Dr. Hettle. (*Id.*)

In June 2016, Dr. Hettle performed the EMG of Plaintiff's wrist and diagnosed Plaintiff with "very severe, acute median neuropathy at the left wrist." (*Id.* at PageID.1818.) Dr. Fernandez noted that he was "concerned about possible space occupying [the wrist] lesion per the EMG" and additionally referenced Plaintiff's "chronic low back pain." (*Id.*)

In December 2016, Plaintiff went to the emergency room after experiencing a "pop" in her lower back while squatting. (ECF No. 29-11, PageID.2236.) Plaintiff rated her pain as a nine out of ten. (*Id.*) The hospital performed a CT scan and noted the following observations: moderate T11-T12 disc space narrowing, a Schmorl's node on T11 with adjacent sclerotic change, minimal disc bulge around L2-L3, a broad disc bulge around L3-L4, and postoperative decompression at L4-L5 with moderate facet arthropathy and mild stenosis. (*Id.*) The hospital's formal diagnosis was: "postoperative changes L4-L5 with mild stenosis," "disc material" exiting the right L3 nerve root, and "posterolateral disc protrusion at L3-L4." (*Id.* at PageID.2337.) The hospital noted that there had been "no acute fracture or subluxation" of the spine. (*Id.*)

In February 2017, Plaintiff went back to Dr. Fernandez for an MRI of her left wrist. (ECF No. 36, PageID.3156.) Plaintiff complained of numbness in her thumb and first two fingers along with intermittent swelling. (*Id.*) After reviewing the MRI, Dr. Fernandez noted a ganglion cyst near the carpal tunnel, as well as a "relatively large tear" and "advanced degenerative changes of the first [] metacarpal joint and moderate degenerative changes throughout the carpus." (*Id.*)

Also in February 2017, Plaintiff began consulting with Dr. Kavitha Reddy at Great Lakes Interventional Pain Management for her lower back pain. (ECF No. 36, PageID.3158.) Dr. Reddy affirmed Plaintiff's diagnosis of chronic low back pain and advised that Plaintiff continue with her pain medications. (*Id.* at PageID.3159.) Dr. Reddy also affirmed that the February 2016 MRI showed postsurgical changes to Plaintiff's spine. (*Id.*) Dr. Reddy noted that Plaintiff now had an "antalgic and limping" gait, that Plaintiff experienced pain when walking on her heels, and that Plaintiff's range of motion in her lumbar area was "limited." (*Id.*) Finally, Dr. Reddy proposed additional therapeutic injections and surgical options to Plaintiff. (*Id.*) Plaintiff consulted Dr. Reddy again for pain in March 2017. (*Id.* at PageID.3161.)

In April 2017, Plaintiff visited Dr. Dass, an orthopedic surgeon, for her wrist numbness and pain. (*Id.* at PageID.3164.) Dr. Dass recommended "surgical decompression of the median nerve" because "conservative, non-operative options ha[d] failed." (*Id.* at PageID.3167.) Dr. Dass intended to schedule the surgery "as soon as possible." (*Id.*)

On May 4, 2017, the McLaren Regional Medical Center performed a CT scan of Plaintiff's lumbar spine after Plaintiff rated her pain at a ten out of ten. (ECF No. 29-11, PageID.2312.) The attending physician noted that Plaintiff had "lumbar spondylosis and degenerative disc disease," but that the diseases had "not significantly changed" from an unspecified previous time. (*Id.* at PageID.3170.)

May 9, 2017 was Plaintiff's last full day of work. (ECF No. 29-8, PageID.1812.) Plaintiff attested that, while her pain increased after returning to work in November 2015, she had attempted to "perform [her] job into May of 2017."[2] (ECF No. 29-8, PageID.1811.) Despite Plaintiff's

---

[2] Other anecdotal evidence in the administrative proceedings suggests that Plaintiff's abilities deteriorated during this time period. One of Plaintiff's clients— who attested that she had worked with Plaintiff "on a daily basis" for over eleven years—stated that despite Plaintiff being "one of the most reliable sales representatives [she] had ever dealt with," the client "began to notice uncharacteristic

efforts, on May 9, 2017, her back "simply gave out" during an "unexpected family emergency." (*Id.* at PageID.1811-1812.) Plaintiff took a week of medical leave following this event before her manager suggested that she use the rest of her vacation time for the year. (*Id.* at PageID.1812.) After exhausting her final two weeks of vacation time, Plaintiff realized "that [her] condition was not improving and [she] was unable to return to work, on either a full or part-time basis." (*Id.*) Plaintiff notified DWF that she would not be returning to work, and May 9, 2017 became Plaintiff's last official day at DWF. (*Id.*)

On June 12, 2017, Dr. Hak signed an affidavit attesting that Plaintiff would be unable to work, even with modifications, unless her condition improved. (ECF No. 29-9, PageID.1999.) Dr. Hak attested that Plaintiff would be restarting her epidural injections. (*Id.*) Dr. Hak also attested that Plaintiff was unable to lift or carry anything above ten pounds, that Plaintiff should only occasionally attempt to lift anything under ten pounds, that Plaintiff was unable to sit for more than an hour at a time, that Plaintiff was unable to stand or walk for more than a half

---

mistakes in the packaging of [Plaintiff's] product" in 2016 and 2017. (ECF No. 29-8, PageID.1807.)

hour at a time, that Plaintiff could not bend at all, and that Plaintiff could not spend more than a half hour to an hour on her feet at a time. (*Id.* at PageID.1998.)

## C. Administrative Proceedings

### 1. Initial Applications and Denial

In June 2017, Plaintiff filed a claim with Defendant requesting short-term disability benefits beginning May 11, 2017. (*See* ECF No. 29-9, PageID.1990.) After requesting and receiving Plaintiff's medical records, (*id.* at PageID.1988, 1990), Defendant denied Plaintiff's claim on August 10, 2017 ("August Denial"). (ECF No. 29-9, PageID.1866.) Defendant's denial letter stated that it took the following information into consideration:

- The short-term disability policy booklet;
- Plaintiff's disability claim forms;
- Office visit notes from Heather Williams, Physician's Assistant;
- MRI of the left wrist dated February 2, 2017;
- Lab work from April 3, 2017;
- Dr. Dass office visit notes from April 10, 2017;
- Dr. Reddy's notes from February 21, 2017 through April 28, 2017;
- Emergency room records from May 4, 2017;
- Dr. Kazem Hak's office notes from May 16, 2017;
- Dr. Hak's attending physician's statement from June 12, 2017;
- Dr. Fernandez's office notes from January 27, 2017; and
- Plaintiff's job description.

(*Id.* at PageID.1773.) After walking through Plaintiff's diagnoses and history of surgeries, injections, and pain medications related to back pain, the August Denial simply concluded: "In summary, the medical documentation fails to support the restrictions and limitations. Therefore, no benefits are payable, and your claim has been denied." (*Id.* at PageID.1773-1774.)

Though the August Denial contained no analysis of its decision and made no reference to its review process, an accompanying Nurse Referral Report was included with the administrative record. (ECF No. 29-8, PageID.1751-1757.) This Report was apparently conducted by Defendant's reviewing nurse contractor in determining whether to award benefits and provided a detailed summary of Plaintiff's medical history. (*See id.*) Unlike the August Denial, the Report contained an analysis of Plaintiff's records. However, the analysis contained contradictions with the data before it. For example, after noting under "RESTRICTIONS AND LIMITATIONS" that Plaintiff could only "[o]ccasionally lift and carry to 10 pounds" and could not stand or walk for more than "1.2 hour each," the Report concluded: "The records available for review do not prevent claimant from lifting up to 20 pounds occasionally and 10 pounds

frequently and sitting, standing and walking up to 6-8 hours in an 8 hour day." (*Id.* at PageID.1752, 1755.) The Report also concluded that Plaintiff's epidural "injections could be scheduled around the claimant's work schedule." (*Id.* at PageID.1755.)

On February 8, 2018, Plaintiff applied for long-term disability benefits, as her short-term benefits would have exhausted in August 2017. (ECF No. 29-2, PageID.497; *See* ECF No. 29-1, PageID.294.)

### 2. ERISA appeal and denial

On February 7, 2018, Plaintiff appealed Defendant's denial of her short-term disability benefits. (ECF No. 29-2, PageID.500.) In addition to the documents previously submitted, Plaintiff attached an affidavit from Dr. Haz—Plaintiff's primary physician of five years—finding her permanently disabled, additional follow-up records from Dr. Fernandez, additional anecdotal affidavits from herself and a longtime client, additional pain management records, and the results of an independent medical exam. (ECF Nos. 29-2 through 29-6.) Dr. Hak's affidavit reiterated Plaintiff's medical history, summarized her treatment attempts, and concluded that:

[Plaintiff's] condition has yet to be resolved by any currently-existing surgical procedures and cannot be significantly addressed through medication . . . Given [Plaintiff's] documented limitations owing to persistent, debilitating back pain, and the fact that her work duties greatly exacerbate her pain, she is unable to return to work . . . the combination of [Plaintiff's] debilitating pain conditions and medication schedule render it impossible for her to perform her own occupation. These facts, individually and taken together, indicate that [Plaintiff] is unable to perform, with any regular continuity, the material duties required for gainful employment. It is my professional medical judgment that, from the perspective of a medical doctor specializing in internal medicine, [Plaintiff] is totally disabled from working at this time . . . [t]his includes both sedentary and non-sedentary occupations, on a full or part-time basis.

(ECF No. 29-6, PageID.1275-1276.)

In addition to Dr. Hak's assessment, Plaintiff's appeal included a January 2018 independent medical evaluation that Plaintiff obtained from Dr. Todd Best, a physician and rehabilitative specialist in Michigan. (*Id.* at PageID.1307.) Dr. Best concurred with Plaintiff's previous diagnoses and concluded that Plaintiff was "totally permanently disabled. She is not capable of any competitive employment." (*Id.* at PageID.1308.) Dr. Best also included a detailed disability assessment that largely concurred with Dr. Hak's 2017 disability assessment. (*Id.* at PageID.1309.) Dr. Best additionally determined that Plaintiff could

never reach above her shoulders and could not stand or walk for more than an hour per day. (*Id.*)

In March 2018, Defendant provided Plaintiff with notice of a provisional denial. Defendant had submitted Plaintiff's medical documents for review to Dr. Margaret Harvey, an orthopedic surgeon, through Dane Street, LLC, an outside medical consulting firm. (ECF No. 29-1, PageID.333.) Defendant stated that, based on Dr. Harvey's report, there were "no clinical findings" to document Plaintiff's chronic low back pain from the short-term disability dates of May 10, 2017 through August 9, 2017. (*Id.*) Defendant gave Plaintiff additional time to supplement the report before it would make a final determination. (*Id.*)

Dr. Harvey's attached report indicated that Dr. Harvey had reviewed all of Plaintiff's medical records, scans, reports, and affidavits from October 2013 through February 2018, including the reports from Dr. Best and Dr. Hak concluding that Plaintiff was totally disabled. (*Id.* at PageID.335-336.) As with the Nurse Referral Report, Dr. Harvey's report contained a number of inconsistencies. For example, though Dr. Harvey concluded that there were "no clinical findings" from May 10, 2017 through August 9, 2017 documenting Plaintiff's disability, (*id.* at

PageID.333), Dr. Harvey also included a summary of the "documentation from the period under review," including:

- Dr. Hak's June 2017 exam where he "diagnosed sciatica and congenital spondylolisthesis," "referred [Plaintiff] to comprehensive pain management," and ordered that "[Plaintiff] was to remain off work until symptoms improved;"
- Dr. Hak's July 2017 exam where he "evaluated the claimant for follow-up fibromyalgia" and noted that "[Plaintiff's] pain was improving slowly, but the claimant still used Norco four times daily;" and
- Dr. Fernandez's July 2017 exam where he "sent [Plaintiff] for injections."

(*Id.* at PageID.337.) Additionally, after concluding that Plaintiff's "self-reported complaints of pain" were undermined by "limited clinical findings," Dr. Harvey then concluded that Plaintiff "had appropriate treatment for . . . chronic low back pain after a lumbar laminectomy. She has had appropriate imaging as well as referral to pain management for injections." Finally, though Dr. Harvey agreed with all diagnoses and stated that "[t]here are no inconsistencies in the available medical records," Dr. Harvey also concluded, without explanation, that there were "insufficient physical exam findings to support work impairment." (*Id.*)

In March 2018, Plaintiff responded to Dr. Harvey's assessment, noting that Dr. Harvey's conclusion was refuted by every doctor who had personally examined Plaintiff. (ECF No. 29-1, PageID.349.) Plaintiff included a supplemental affidavit from Dr. Hak, which responded to Dr. Harvey's conclusions about Plaintiff's subjective pain. (*Id.*) In the supplemental affidavit, Dr. Hak made clear that Plaintiff's diagnoses "are supported by physical examination and MRI imaging." (*Id.* at PageID.359.) Dr. Hak also noted:

> [Plaintiff's] complaints of chronic pain are real and credible and to be medically expected given her diagnoses. I have reviewed [Defendant]'s file reviewer's conclusion that [Plaintiff's] restrictions and limitations are 'not supported.' This is incorrect, particularly because the report does not contest or refute her diagnoses. The medical community recognizes chronic pain as an accompanying symptom to her diagnoses. [Plaintiff's] chronic pain is a symptom of, and is occupationally disabling in light of, her diagnoses.

(*Id.* at PageID.359-360.)

In April 2018, Dr. Harvey provided an addendum to her initial assessment of Plaintiff's medical records. (ECF No. 29-1, PageID.339.) She stated that much of the records were illegible, but in response to Dr. Hak's supplemental affidavit, she repeated that there were "no clinical

findings" and that "[p]hysical examination findings should be documented in order to support impairment." (*Id.* at PageID.340.)

On May 18, 2018, after receiving a clearer copy of the medical records, Dr. Harvey provided an additional addendum to her initial assessment. Dr. Harvey noted that she attempted to call Dr. Fernandez and Dr. Hak several times, but was unable to connect. (ECF No. 29-1, PageID.317-318.) Dr. Harvey stated in her addendum that she had reviewed Plaintiff's supplemental documents, but her updated analysis indicated the opposite. For example, after listing as reviewed documents Dr. Best's 2018 and Dr. Hak's 2017 affidavits—both of which provide detailed work restrictions—Dr. Harvey noted that "[n]o recent work restrictions" had been provided after 2015. (*Id.* at PageID.318-319.) Dr. Harvey's addendum summarily concluded that her recommendation "ha[d] not changed." (*Id.* at 319.)

On June 21, 2018, Defendant issued its final denial of Plaintiff's short-term disability benefits claim ("the June Denial").[3] (ECF No. 29-1,

---

[3] Defendant's denial letter misquoted the Plan's definition of "disability and disabled," defining "disabled" as being "prevented from performing the Material Duties of Your Regular Job." Conversely, the Plan's text defined "disability" as being "prevented from performing *at least one of* the Material Duties of Your Regular Job."

PageID.296.) The June Denial acknowledged that Plaintiff had received a CT scan of her lumbar spine on May 4, 2017 that "documented multilevel degenerative changes." (*Id.* at PageID.298.) However, the June Denial then concluded that Plaintiff's "self-reported complaints of low back pain" during the May-August 2017 time period lacked "[]sufficient physical examination findings to support impairment." (*Id.*) The June Denial ultimately concluded that, even with Dr. Hak and Dr. Fernandez's additional documents, "the documentation submitted for review does not support a total disability for the time period reviewed. The available medical records document self-reported complaints of low back pain; however, there are insufficient physical examination findings to support impairment." (*Id.*)

On August 16, 2018, Defendant also denied Plaintiff's application for long-term disability benefits ("the LTD Denial"). (ECF No. 29-14, PageID.2936.) The LTD Denial relied on the same underlying evidence as it did for the short-term denials, including Dr. Harvey's report, in making its decision. (*Id.*) The LTD Denial recited Plaintiff's medical

history and concluded, without analysis: "In summary, the medical documentation fails to substantiate a condition or conditions that would render you Disabled from performing the Material Duties of your Regular Occupation as an Inside Sales Representative." (*Id.* at PageID.2936-2937.)

### 3. <u>The current litigation</u>

Plaintiff filed this lawsuit seeking short-term and long-term disability benefits on July 24, 2018. (ECF No. 1.) Plaintiff now moves to reverse Defendant's denial of disability benefits, arguing that she sufficiently proved her disability within the meaning of the Plan. (ECF No. 33, PageID.3056.) Plaintiff also requests that Defendant pay Plaintiff's disability claim in the amount of $78,812.21 for benefits owed from May 11, 2017 to the present, as well as immediately instate ongoing benefit payments in the amount of $2,922.60 per month. (*Id.*) Finally, Plaintiff requests a separate hearing for additional relief under ERISA costs and attorney fee provision 29 U.S.C. § 1132(g). (*Id.*)

Defendant moves to affirm its denial of benefits on the ground that Plaintiff cannot prove, by a preponderance of the evidence, that she is entitled to benefits under the Plan. (ECF No. 30, PageID.2970.)

Defendant also argues that, even if Plaintiff were to carry her burden, she cannot prove the damages she alleges because she has "kept secret" whether she has applied for other benefits that would impact the total calculation. (*Id.* at PageID.2991.)

For the reasons below, this Court finds that Plaintiff proved that she was entitled to both short-term and long-term benefits by a preponderance of the evidence and was thus entitled to benefits. The Court therefore GRANTS Plaintiff's motion and DENIES Defendant's. However, the Court cannot determine the appropriate amount of benefits from this record. The case is therefore REMANDED to the administrator to determine the award.

## III. LAW AND ANALYSIS

### A. Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all

facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 Fed. Appx. 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

In reviewing an ERISA benefits dispute brought under 29 U.S.C. § 1132(a)(1)(B), this Court reviews the administrative record and renders "findings of fact" and "conclusions of law." *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). The Court may additionally consider the parties' arguments concerning the proper analysis of evidence "contained in the administrative record." *Id.*

The standard is *de novo* review. Colorado, which governs the Plan at issue, prohibits policies containing discretionary authority clauses that would trigger the more deferential arbitrary and capricious standard of review. (ECF No. 29-9, PageID.2015; C.R.S. § 10-3-1116(2)). The Sixth Circuit has held that the Court's role in reviewing *de novo* a denial of benefits under ERISA "is to determine whether the administrator . . . made a correct decision. The administrator's decision is accorded no deference or presumption of correctness. The review is limited to the record before the administrator and the court must

determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Hoover v. UnumProvident*, 290 F.3d 801, 808-09 (6th Cir. 2002) (internal quotations omitted).

To succeed on an ERISA disability benefits claim, Plaintiff must prove by a preponderance of the evidence that she is entitled to benefits within the meaning of the Plan. *Javery v. Lucent Technologies, Inc., Long Term Disability Plan for Mgmt. or LBA Emples.*, 741 F.3d 686, 700 (6th Cir. 2014). After a careful review of the full administrative record, this Court concludes that Plaintiff established that she was disabled within the meaning of the Plan.

## B. Plaintiff demonstrated, by a preponderance of the evidence, that she was disabled and entitled to both short-term and long-term benefits

Under the terms of Defendant's Plan, Plaintiff was entitled to both short-term and long-term disability benefits if she could demonstrate four conditions:

1) Plaintiff suffered from an injury or sickness;

2) Plaintiff's injury or sickness caused a significant change in her mental or physical functional capacity;

> 3) Plaintiff's injury or sickness prevented her from performing at least one of the material duties of her regular job on either a full or a part-time basis; and
>
> 4) Plaintiff's injury or sickness also prevented her from generating more than 99% of her weekly earnings in other ways.

(ECF No. 29-1, PageID.287.)

For the reasons below, Plaintiff's application for disability benefits satisfied all four requirements, and Defendant "[im]properly interpreted the plan" in concluding otherwise. *Hoover*, 290 F.3d at 808-09.

1. <u>Plaintiff demonstrated that she had an injury or sickness within the meaning of the Plan</u>

Plaintiff's medical record clearly demonstrated—and Defendant does not dispute—that multiple examining physicians diagnosed Plaintiff with, and treated her for, a number of conditions, including: lumbar spondylosis, lumbar degenerative disc disease, L4-5 stenosis, diffuse disc bulging, chronic low back pain, neurogenic claudication, bilateral lower extremity radiculopathy, postsurgical scarring, postoperative decompression at L4-L5, posterolateral disc protrusion, and carpal tunnel syndrome. (ECF No. 29-8, PageID.1822, 1829; ECF No. 36, PageID.3156; ECF No. 29-1, PageID.333 (Dr. Harvey noting her

agreement with the diagnoses and concluding that there are "no inconsistencies" in the available medical records).)

These conditions fall within the Plan's definition of "sickness" as "a disease, disorder or condition, including pregnancy, that requires treatment by a Physician." (ECF No. 29-1, PageID.289.) Plaintiff satisfied this condition by a preponderance of the evidence.

2. Plaintiff demonstrated that her conditions caused a significant change in her physical functional capacity

Though the Plan requires that beneficiaries demonstrate "a significant change" in their functional capacity, the Plan does not define "significant change." Though the parties did not formally address this issue in the underlying proceedings, this Court finds that Plaintiff's application demonstrated, by the preponderance of the evidence, that her medical conditions caused a significant change in her functional capacity. Plaintiff satisfies this condition.

When an ERISA plan fails to define a term, the term's "plain language . . . should be given its literal and natural meaning." *See Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir. 1997). The plain language of the phrase "significant change in . . . functional capacity"

implies that a claimant underwent a major shift in her ability to function.[4] The Court finds, for the reasons below, that Plaintiff proved by the preponderance of the evidence that her conditions caused her to undergo several significant and detrimental changes in her ability to function.

Plaintiff worked for DWF for twenty-seven years. Plaintiff attested, and Defendant has not argued otherwise, that Plaintiff "never once applied for unemployment or government benefits" prior to her 2017 disability benefits application. (ECF No. 29-8, PageID.1814.) Additionally, one of Plaintiff's long-term clients attested that, in her eleven years of working with Plaintiff, Plaintiff was "one of the most reliable sales representatives [she] had ever dealt with" until 2016, when the client noticed that the quality of Plaintiff's work was beginning to decline. (*Id.* at PageID.1807 ("I began to notice uncharacteristic mistakes in the packaging of [Plaintiff's] product.")

---

[4] The *Merriam-Webster* dictionary definition of "significant" is "of a noticeably or measurably large amount." *Significant*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/significant (last visited Dec. 5, 2019). The *Merriam-Webster* dictionary definition of "change" is "to make different in some particular." *Change*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/change (last visited Dec. 5, 2019).

Plaintiff's medical evidence supports this anecdotal evidence. Plaintiff first began seeking medical help for lower back pain in 2014. (ECF No. 29-10, PageID.2230, 2232, 2234.) Though Plaintiff underwent a series of treatments that provided some initial relief from 2014 to 2015, Plaintiff continued to decline in the long term. Plaintiff received her first deteriorative diagnosis in July 2015—lumbar spondylosis, lumbar degenerative disc disease, disc bulge, and low back pain—as well as the first indication from a doctor that Plaintiff's work may be exacerbating her pain. (ECF No. 29-8, PageID.1828-1829.) Plaintiff underwent back surgery that year. (*Id.* at PageID.1837)

In February 2016, Plaintiff's doctors began to more aggressively indicate that Plaintiff's work was contributing to the decline of her spinal health, and in Summer 2016 Plaintiff was diagnosed with "postoperative changes" to her back and "very severe, acute median neuropathy at the left wrist." (ECF No. 29-8, PageID.1823.) Plaintiff's condition was further exacerbated in December 2016, when she sustained a lower back injury while squatting and went to the emergency room. (ECF No. 29-11, PageID.2236.)

By February 2017, Plaintiff was receiving more intense treatment for both her carpal tunnel and her back pain. Plaintiff had a full-time pain consultant in Dr. Reddy, who noted that Plaintiff was now walking with an "antalgic and limping gait" and that Plaintiff's range of motion was now "limited." (ECF No. 36, PageId.3158-3161.) By May 2017, Plaintiff had been advised that "conservative, non-operative options" for her carpal tunnel "had failed," and Plaintiff's degenerative disc disease had again sent her to the hospital. (ECF No. 36, PageID.3167; ECF No. 29-11, PageID.2312, 3170.) It was after this point that Plaintiff's regular treating physician of five years ultimately concluded that Plaintiff was now "totally" disabled. (ECF No. 29-9, PageID.1998.)

In short, Plaintiff's medical and anecdotal evidence evinces a clear portrait of a woman whose condition began to slowly decline in 2014, and then significantly declined further at various points in 2015, 2016, and 2017, culminating in May 2017 with a complete inability to stand, carry, sit, or walk without severe restrictions. There is no language in the Plan suggesting that the "significant change" must happen instantly instead of gradually, and Defendant may not read this additional requirement into the text. *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th

Cir. 2004) (even a deferential review of an administrator's decision "does not [grant administrators] the authority to add eligibility requirements to the plan").

The nature of a degenerative health condition—such as Plaintiff's degenerative disc disease—is that an individual's health deteriorates over time. Though Plaintiff and Defendant debate whether and when a pivotal moment took place where Plaintiff's health suddenly "significantly change[d]," the Plan's language does not require such a showing. Instead, it is sufficient to show—and Plaintiff did show—that within the period during which the Plan applied to Plaintiff, Plaintiff's condition caused a significant change in her functional capacities. The Plan began to apply to Plaintiff on January 1, 2016. (ECF No. 1-2, PageID.22-23.) In January 2016, Plaintiff suffered pain, discomfort, and some limitation as a result of her illnesses, but these conditions were not yet disabling. (ECF No. 29-8, PageID.1823.) By May 2017, Plaintiff's illnesses had so progressed that Plaintiff was medically prohibited from performing such simple tasks as walking, standing, and bending for longer than an hour at a time. (ECF No. 29-9, PageID.1998.) If such a profound deterioration does not constitute a "significant change" under a

natural and literal reading of the term, it is difficult to imagine what would.

Defendant analogizes this case to *Koning v. United States of Omaha Life Ins. Co.*, where the "significant change" language in Defendant's Plan was once again at issue. No. 1:13-CV-1005, 2014 WL 11281424, at *6 (W.D. Mich. Aug. 19, 2014). In *Koning*, the plaintiff had maintained a relatively consistent regimen of back pain management through injections and physical therapy from 2009 to 2013. *Id.* at *3. In upholding Defendant's denial of benefits, the court defined "significant change" as a "real, objective change in [] actual capacity," and not a mere "change in [the] subjective experience of a long-term problem with back pain." *Id.* Noting that Koning could not support her subjective claims of pain with "objective medical evidence," the court concluded:

> At bottom, the only thing the Court could find that changed in July 2013 is plaintiff's subjective attitude. She was no longer willing to work with the same physical capacity she had been working with since 2006. Subjective reports of greater pain or need for stronger pain medication [] are not, standing alone, sufficient to establish disability.

*Id.* at *6.

Even if this Court were to adopt the *Koning* court's attitude toward subjective reports of increased pain,[5] Plaintiff in this case has produced substantial "objective" evidence of pain. By the time Plaintiff applied for benefits, Plaintiff had unsuccessfully attempted an increasingly aggressive regimen of opioid medication, physical therapy, spinal injections, and surgery. Unlike the *Koning* court's characterization of Koning as making a "personal decision" to stop tolerating a stable condition, Plaintiff here produced objective evidence documenting her unsuccessful attempts to treat an increasingly debilitating disease.

Plaintiff demonstrated, by a preponderance of the evidence, that she experienced a significant change in her functional abilities within the meaning of the Plan.

3. <u>Plaintiff demonstrated that her conditions prevented her from performing at least one of the material duties of her regular job on either a full or a part-time basis</u>

---

[5] Which this Court does not, and indeed, the Sixth Circuit also rejected this argument on appeal. *Koning v. United of Omaha Life Ins. Co.*, 627 Fed. Appx. 425, 437-38 (6th Cir. 2015) ("[P]ain is an inherently subjective condition, but no less capable of being disabling . . . complaints of pain necessarily are subjective as they are specific to the patient and are reported by the patient.") (Internal quotations omitted).

Defendant categorized Plaintiff's occupation as a "light strength job," which required Plaintiff to exert up to twenty pounds of force occasionally, up to ten pounds of force frequently, and negligible force constantly to move objects. (ECF No. 29-1, PageID.297.) The position also required Plaintiff to walk and stand to a significant degree, to sit "most of the time," and to be constantly pushing or pulling materials of negligible weight. *Id.* Defendant's description noted that "light" jobs "can be and [are] physically demanding of a worker even though the amount of force exerted is negligible." *Id.*

In the underlying proceedings, Plaintiff produced two affidavits from doctors who physically examined her. Both doctors concluded that, at the time that Plaintiff requested disability, she could never lift or carry anything above ten pounds, she could only occasionally attempt to lift anything under ten pounds, she was unable to sit, stand, or walk for more than an hour at a time. (ECF No. 29-6, PageID.1309; 29-9, PageID.1998.) Plaintiff also produced numerous x-rays, pain medication logs, diagnoses, surgery charts, appointment records, and affidavits from two examining physicians and a client attesting to Plaintiff's inability to perform in her current position. (ECF No. 29-9, PageID.1773.) In short, Plaintiff

produced a significant and meaningful amount of evidence suggesting that she was medically unable to perform at least one—if not most—of her material duties.

In determining whether to grant benefits, Defendant relied on a nurse and a physician to review Plaintiff's medical records. Neither reviewer personally examined Plaintiff. While there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295-96 (6th Cir. 2005), singular reliance on a physician's file review without a physical examination can "raise questions about the thoroughness and accuracy of the benefits determination." *Id.* In Plaintiff's case, both the nurse and doctor reviews demonstrated clear inconsistencies that render suspect the thoroughness and accuracy of Defendant's process. The nurse file reviewer, for example, concluded both that Plaintiff could not stand or walk for more than "1.2 hour each," and also that nothing prevented Plaintiff from "walking up to 6-8 hours in an 8 hour day." (ECF No. 29-8, PageID.1752, 1755.) Similarly, after listing several July 2017 clinical findings documenting Plaintiff's disability, Dr. Harvey concluded that there were "no clinical findings" from May 10,

2017 through August 9, 2017 documenting Plaintiff's disability. (ECF No. 29-1, PageID.337.) These multiple, alarming inconsistencies support Plaintiff's argument that Defendant did not undertake a good-faith review of Plaintiff's application.

Defendant's formal denials fare no better. Defendant's stated reason for denying Plaintiff's short-term disability benefits was: "The available medical records document self-reported complaints of low back pain; however, there are insufficient physical examination findings to support impairment . . . we believe that [Plaintiff] would not be restricted from performing the duties of her regular job." (ECF No. 29-1, PageID.299.) Defendant's stated reason for denying Plaintiff's long-term disability benefits was: "[T]he medical documentation fails to substantiate a condition or conditions that would render you Disabled from performing the Material Duties of your Regular Occupation." (ECF No. 29-14, PageID.2936-2937.) Though the formal letters dutifully summarized the evidence that Plaintiff submitted, these conclusory denials did not meaningfully address Plaintiff's application and did not provide Plaintiff a basis for understanding what more she could have done to demonstrate a disability. Insurance administrators "may not

arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Nor may administrators "engage [] in a selective review of the administrative record to justify a decision to terminate coverage." *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (internal quotation marks omitted). In doing precisely these things, Defendant improperly administered the Plan in denying Plaintiff benefits.[6] *Hoover*, 290 F.3d at 808-09.

This Court finds that the affidavits of Plaintiff's two examining physicians, plus the body of medical evidence documenting Plaintiff's deteriorating condition from 2016 to 2017, demonstrate by a preponderance of the evidence that Plaintiff's condition prevented her

---

[6] Plaintiff additionally argues that Defendant committed a *per se* ERISA violation by misquoting the Plan's language in its June 2018 final short-term benefits denial. (ECF No. 33, PageID.3083.) Plaintiff argues that Defendant's erroneous definition of "disability" misleadingly implied that Plaintiff needed to show an inability to perform *all* material duties—not merely an inability to perform *one* material duty. (*Id.*) While the Court agrees that this language is misleading, Defendant only used this incorrect language in its final, "unappealable" administrative denial. (ECF No. 29-1, PageID.299.) Defendant otherwise used the correct definition in its other correspondences with Plaintiff. It is not clear that Defendant intended to hold, or that Plaintiff believed herself to be held, to the higher standard of showing an inability to perform all material duties under the Plan. On this record, the Court is unwilling to consider this letter a *per se* ERISA violation.

from performing several of her material duties, including: the requirement that Plaintiff be able to lift up to twenty pounds of force occasionally, the requirement that Plaintiff be able to lift up to ten pounds of force frequently, the requirement that Plaintiff sit "most of the time" during an eight-hour shift, the requirement that Plaintiff walk and stand to a significant degree, and the requirement that Plaintiff "constantly" push and pull materials of negligible weight.

4. <u>Plaintiff demonstrated that her conditions prevented her from generating more than 99% of her weekly earnings in other ways</u>

Plaintiff submitted two affidavits from examining physicians—one of whom had regularly treated Plaintiff since 2013—concluding that Plaintiff was "totally" disabled. Dr. Hak wrote that Plaintiff was "totally disabled from working at this time . . . [t]his includes both sedentary and non-sedentary occupations, on a full or part-time basis." (ECF No. 29-6, PageID.1276.) Dr. Best concluded that Plaintiff was not only "totally permanently disabled," but that she was "not capable of any competitive employment." (ECF No. 29-6, PageID.1308.)

These affidavits support the additional medical and anecdotal evidence that Plaintiff submitted, as discussed above. Though the parties

did not argue this issue in the administrative proceedings below, the Court finds that Plaintiff's application demonstrated, by a preponderance of the evidence, that her medical conditions prohibited her from generating more than 99% of her weekly earnings in other ways.

## C. Remedy

1. Benefit Award

When a reviewing court determines from the administrative record that a claimant is entitled to disability benefits, the court may issue an order requiring the insurer to award benefits. *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 513 (6th Cir. 2005). Having determined that Plaintiff is entitled to both short-term and long-term disability benefits as a matter of law, the Court ORDERS Defendant to pay Plaintiff what she is due. The only question remaining is the sum, both retroactive and ongoing, to which Plaintiff is entitled.

The Plan's short-term benefits policy provides beneficiaries with weekly pay that is 60% of a beneficiary's gross weekly earnings, and the long-term benefits policy provides beneficiaries with monthly pay that is 60% of the beneficiary's gross monthly earnings. (ECF No. 29-1, PageID.271-272; ECF No. 8-3, PageID.136.) Both "basic weekly earnings"

and "basic monthly earnings" are to be calculated from Plaintiff's "hourly rate of pay in effect on the day immediately prior to [Plaintiff's] disability multiplied by the hour number of hours [Plaintiff] worked . . . during the 12 month period immediately prior to the date on which your Disability began." (ECF No. 8-2, PageID.104; ECF No. 8-3, PageID.135.) Notably, though Plaintiff and Defendant both attempt a benefit calculation, there is little evidence in the administrative record of Plaintiff's hourly pay during the twelve months prior to May 2017. Because the Court cannot attempt this calculation without this missing evidence, the Court remands this case to the administrator to award Plaintiff both short and long-term benefits in accordance with the terms of the Plan.

Defendant, citing to Plaintiff's 2016 W-2 but without further calculation, claims that benefits would likely not exceed "approximately $36,000.00." (ECF No. 30, PageID.2991-2992.) Plaintiff calculates that, as of August 1, 2019, benefits should total $78,812.21. (ECF No. 40, PageID.3243.) There is only one piece of evidence in this administrative record suggesting Plaintiff's weekly earnings in 2017, and that is a "synopsis note" in one of Defendant's call logs indicating that Plaintiff's weekly earnings were $1,136.48 per week. (ECF No. 29-14, PageID.2964.)

There is no additional information or calculation accompanying this synopsis note. (*Id.*)

Plaintiff's 2016 W-2 is also a part of this record. (ECF No. 29-9, PageID.2001-2002.) But as Plaintiff points out, this information is unhelpful in generating Plaintiff's weekly earnings in 2017, which is a key calculation upon which Plaintiff's benefits are based. (*See* ECF No.40, PageID.3246.) Finally, Plaintiff attached a copy of her pay history during responsive briefing, (ECF No. 42, PageID.3298-3305), but this information was not initially part of the administrative record. *See Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 618 (6th Cir. 1998) (district courts may not consider ERISA evidence outside of the administrative record on summary judgment, unless "the evidence is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part"). Further, even if the evidence were admissible, it does not contain a clear method for deducting excluded income, including: commission, overtime, differentials, or any additional compensation. Because the Plan awards

disability benefits less this additional income, the Court is not in a position to make these calculations with the record before it.[7]

In short, while Plaintiff is entitled to both short-term and long-term benefits, the question of benefit *amount* is not appropriate for summary judgment on this record. *Wilkins*, 150 F.3d at 618. Further, because Defendant never reached the administrative stage of calculating Plaintiff's benefits, the parties are premature in debating what "other income"—such as Social Security—should have fairly been considered in those calculations.

For these reasons, the Court ORDERS that Defendant pay Plaintiff the short-term and long-term disability benefits to which she is entitled from May 25, 2017 through the present day. These benefits are to be administered according to the Plan and are to continue according to the Plan until the applicable pay period contractually expires or until

---

[7] Plaintiff also argues that her benefits can alternatively be calculated, based on the Plan's "Verified by Premium Clause," by "(1) generating the total monthly premium paid figure by doubling the premium paid by an employee, and then (2) solving for the total dollars insured under that year's applicable declared premium rider ratio." (ECF No. 40, PageID.3247.) However, the Court is unwilling to employ this adjacent method when the Plan specifies a clearer, preferred calculation: a simple percentage of Plaintiff's gross weekly and monthly earnings.

Defendant affirmatively and correctly determines that Plaintiff is no longer entitled to long-term benefits under the Plan's terms. *Wagner v. American United Life Insurance Co.*, 731 Fed. Appx. 495, 498 (6th Cir. 2018). Defendant shall determine and administer Plaintiff's disability payments from Plaintiff's weekly and monthly income in the twelve months prior to May 10, 2017, and shall use the calculations provided in the Plan.

2. Attorney Fees and Costs

Plaintiff additionally seeks relief under 29 U.S.C. § 1132(g)(1). ERISA allows courts to award attorney fees to either party, so long as that party achieved "some success on the merits." *Guest-Marcotte v. Life Ins. Co. of North America*, 768 Fed. Appx. 357, 360 (6th Cir. 2019) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010)); *see id.* Plaintiff has not fully briefed this issue; nor has Defendant responded to it. Plaintiff may submit a memorandum on these issues on or before three weeks from the date of this Order. Defendant's response shall be due two weeks from the date of the memorandum.

IV. **CONCLUSION**

For the reasons set forth above, the Court GRANTS Plaintiff's motion for judgment on the administrative record and DENIES Defendant's motion for judgment affirming denial of benefits. Defendant is ORDERED to pay Plaintiff's short-term and long-term benefits in accordance with the Plan. Should Plaintiff wish to pursue attorneys' fees, Plaintiff may submit briefing as ordered above.

IT IS SO ORDERED.

Dated: December 17, 2019       s/Judith E. Levy
Ann Arbor, Michigan          JUDITH E. LEVY
                                 United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, December 17, 2019, using the Electronic Court Filing system and/or first-class U.S. mail.

                                 s/William Barkholz
                                 Case Manager